**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**PAULA M. ROE-MIDGETT, Individually**
**and as Collective Action**
**Representative and PAUL DECKER,**
**Individually and as Collective Action**
**Representative,**

**Plaintiffs,**

**v.**

**CC SERVICES, INC.,**

**Defendant.**                                         **No. 04-CV-4051-DRH**

**MEMORANDUM and ORDER**

**HERNDON, District Judge:**

### I.  **Introduction and Procedural Background**

Now before the Court are three motions for summary judgment: two filed by Defendant CC Services, Inc. (Docs. 63 & 67) and a cross motion for summary judgment filed by Plaintiffs (Doc. 78). CC Services, Inc., moves for summary judgment arguing that it is entitled to summary judgment on Plaintiffs' claims as it has appropriately categorized the Material Damage Appraiser II, the Field Claim Representative II, Field Claim Representative III and Property Specialist I positions as exempt from overtime wages under the Fair Labor Standards Act. Specifically, CC Services, Inc. argues that these positions fall within the administrative exemption of the Fair Labor Standards Act. Plaintiffs oppose

summary judgment as to these four positions maintaining that they are not exempt under the administrative exemption and filed a cross motion for summary judgment as to the Material Damage Appraiser II position.  Based on the record, the applicable case law and the following, the Court grants Defendant's motions for summary judgment and denies Plaintiffs' cross motion for summary judgment.

On January 30, 2004, Roe, on behalf of herself and all similarly situated individuals, filed a two-count complaint against Illinois Agricultural Association and CC Services, Inc. ("CC Services") in the Williamson County, Illinois Circuit Court alleging violations of the Fair Labor Standards Act, **29 U.S.C. § 201 *et seq.***, ("FLSA") (Count I) and the Illinois Minimum Wage Law ("IMWL") (Count 2) (Doc. 2).[1] Specifically, Roe's complaint alleges that CC Services unlawfully classified her as exempt from overtime payments under Federal and State laws and failed and refuses to pay her and the putative class members overtime pay for overtime work.  Count I is a putative *collective* action under the FLSA and Count II is a putative *class* action under the IMWL.  On March 2, 2004, Defendants removed the case to this Court based on federal question jurisdiction, **28 U.S.C. § 1331**, and supplemental jurisdiction, **28 U.S.C. 1367** (Doc. 1).

On July 16, 2004, the Court denied Defendant's motion to dismiss (Doc. 39).  On August 10, 2004, Magistrate Judge Proud allowed Roe leave to file a First Amended Complaint which Roe filed on August 16, 2004 (Doc. 43).  The First

---

[1]On June 25, 2004, the Court entered an Order granting Roe's motion to voluntarily dismiss without prejudice Illinois Agricultural Association as a Defendant (Doc. 38).

Amended Complaint added Paul Decker as a named Plaintiff against CC Services (Doc. 43). Count I alleges violations of the FLSA and Count II alleges violations of the IMWL. On October 2, 2004, Plaintiffs filed a motion to certify a collective action of persons pursuant to the FLSA (Doc. 45). On November 16, 2004, CC Services and Plaintiffs filed a joint stipulated certification of a collective action with respect to four classes: Material Damage Appraiser II ("MDA"), Field Claim Rep II (FCR II), Field Claim Rep III (FRC III) and Property Specialist I (PS I) (Doc. 49). On July 18, 2005, Plaintiffs moved to amend their complaint to bring collective and class-action claims for three new named Plaintiffs and three new employee classifications (Doc. 59). On August 10, 2005, the Court denied the motion to amend (Doc. 69). On March 16, 2006, the Court pursuant to **28 U.S.C. § 1367(c)**, granted Plaintiffs' motion to sever and remand (Doc. 89) and remanded Count II of the First Amended Complaint to the Circuit Court of Williamson County, Illinois (Doc. 94).

## II. <u>Facts</u>[2]

CC Services is a company which contracts with several insurance companies to provide personnel services, including all services in the insurance claims area. CC Services' insurance company customers include, among others, Country Preferred Insurance Company, Country Life Insurance Company, Country Mutual Insurance Company, and Country Casualty Insurance Company. CC Services

---

[2]The following facts are taken from Defendant and Plaintiffs' statements of undisputed facts (Docs. 65 & 81). The Court used only the facts that are neither disputed nor objected to by the parties.

does adjusting work for County Mutual Insurance Company and affiliates but does not produce insurance policies. CC Services' insurance company customers provide a wide variety of insurance policies including auto, home, commercial, and farm policies. MDAs, FCRs, and PSs work with several types of policies including Farm, Home, Commercial and Auto policies.

As part of the service contract between CC Services and its customer insurers, CC Services employs a Claims Division. Claims Division employees were responsible for paying out $606,300,333.00 in claims for the year 2004. The Claims Division is composed of the Corporate Claims Office, which is located in Bloomington, Illinois and 37 Field Offices. Each Field Office generally has employees in the following positions: MDAs, FCRs, PSs, Material Damage Specialists, Liability Specialists, a Field Claims Supervisor and several Claims Support Representatives.

Each of the positions within the Claims Division, with the exception of clerical staff, has an authority within which he or she may settle a claim and write a check to the claimant without authorization from another employee. This settlement authority level applies per indemnity. When an employee is hired in, he or she may start with a lower settlement authority, but after some training the new employee would be moved up to the authority level for that position. In 2002, 94.22% of claims settled for less than $10,000.

There is a Field Claims Supervisor staffed in each Field Office. All employees in a Field Office report to the Field Claims Supervisor. The Field Claims Supervisor conducts yearly performance reviews. Some Field Claims Supervisors

also hold monthly staff meetings for all employees in their office.  On claims from the Corporate Claims Office, a MDA's supervisor will never see the completed evaluation because the evaluation will be returned to the Corporate Claims Office.  Field Supervisors do not exert as much supervision over MDAs as they do over FCRs.

The Field Claims Supervisor is responsible for examining files at periodic intervals if the file is open.  In this open file review, the Field Claims Supervisor does not make substantive changes in the payment amounts or decisions by his employees.  The Field Claims Supervisor tries to observe whether an employee is adhering to the Best Practice standards.  Best Practice standards refer to the timeliness in which the contact is made with the insured and in which the investigation is completed.  The Field Claims Supervisor also tries to monitor that claims are appropriately documented and timely completed in accordance with state law and regulations by the Department of Insurance.  The review is directed at compliance with Best Practices and compliance with state law to determine that sufficient documentation is present.

After a file is completed, a Field Claims Supervisor conducts a closed file review.  This review is conducted to ensure compliance with CC Services' Best Practice guidelines and the Department of Insurance regulations.  Closed file audits are conducted on only a random sampling of files, not on all of the files.  A closed file audit is performed by the Internal Audit Team for purposes of determining leakage.  Leakage, which refers to the identification of a claim overpayment, is measured by a closed file audit.  From the closed file audit, leakage is determined if the file does

not contain complete and accurate documentation supporting the payment made on the claim.  MDAs are only held to a 5% leakage standard.  The closed file review and the closed file audit results are not used to go back and change the decision made on the closed files, but rather are used to train adjusters for their work on future files.  Both of these audits are conducted after the files are closed.  No changes are made to the FCR or PS's decisions as a result of findings in audits.

Best Practices are four guidelines with which all claims employees are expected to comply.  The Best Practices guidelines are contained in the Claims Manual.  The four Best Practice Guidelines are:

> (1) Make a Meaningful First Contact with the insured as soon as possible on all same business day losses reported prior to 3:00 P.M. (caller's time).  After 3 P.M. the Meaningful First Contact must be made prior to the end of the next business day MORNING.
> (2) Contact Claimant within 24 hours and all other known relevant parties per applicable guidelines within 2 working days of when a loss is reported.
> (3) Complete investigation per applicable guidelines within 4 working days of when loss is reported.
> (4) Complete MD and Property Inspections within 3 working days of date reported, or at time requested by client.

Best Practices do not tell an adjuster how to investigate, evaluate and resolve a complaint.  The Claims Manual and other information given to Claims Division employees do not explain how to resolve any particular claim because all claims are different and must be resolved individually.

Department of Insurance regulations and state law mandate that claims be investigated and resolved within a certain amount of time and that they contain very specific documentation.  Department of Insurance regulations are contained in

the Claims Manual, a guide to which all Claims Division employees have access.  The Best Practice guidelines are also in place so that CC Services complies with Department of Insurance regulations.  FCRs, PSs, and MDAs utilize checklists and the Claims Manual.  The check lists provided to FCRs, PSs and MDAs detail the tasks, sequencing and documentation requirements for particular adjusting tasks.

**Plaintiffs**

Paula Roe-Midgett ("Roe-Midgett") was a MDA since at least January 1, 2001, until her employment ended.  She was employed by CC Services since at least January 1, 2001.  During her tenure as a MDA, Roe-Midgett worked in a Model Office operated by CC Services in Harrisburg, Illinois.  Roe-Midgett's leakage percentage was .89%.  Roe-Midgett's individual appraisal amounts for repairables for the period January through November 2002 consisted of an average appraisal dollar amount of $1,724.01.

Paul Decker ("Decker") has held the positions of FCR III and PS I since at least January 1, 2001, until his employment ended.  Decker was employed by CC Services since at least January 1, 2001.

**MDA II**

The pay range for the MDA II position is $36,952.00 to $55,427.00. MDAs are paid a set predetermined salary on a bi-weekly basis.  MDAs are not docked pay for partial day absences or violations of rules.  The work of a MDA is nonmanual, except occasional manual work that is ancillary to the MDA's primary duties.  The MDAs' duties include inspecting, appraising and settling first and third

party physical damage vehicle claims within a prescribed authority level.  A MDA is expected to verify facts and prepare photographic and written documentation of loss through interviews with involved parties, witnesses, police personnel and others as required.  The inspection and estimation of the MDA's job relates to vehicle damage as opposed to real property damage.  They receive some standardize training from CC Services on completion of job tasks and on the use of software systems.

In June 2003, the MDA average appraisal dollar amount for repairables was $1,884.78.  The average monthly damage pay-outs ranged between $1,750 to $2,400 and with respect to MDAs, the payout amount of repairables was consistent with the estimate amount.

MDAs are responsible for writing estimates on damaged vehicles.  A MDA represents CC Services and its insurance company customers by negotiating with body shops, with insureds and with claimants.  Also, a MDA may negotiate with body shops by asking them to repair a part instead of replacing it.  A MDA may negotiate with the body shops regarding their hourly rate and/or the number of hours required to make repairs or replacements.  The ability to effectively discuss repairs with auto body repair shops is directly related to the skill and experience of MDAs with repair costs and estimates.  The decision to repair or replace a part is a function of skill and knowledge rather than judgment.  Because knowledge and skill related to auto repair is the primary basis for effective negotiation by MDAs with repair shops; CC Services gives preference to persons with body shop experience in hiring MDAs.

When MDAs write an estimate, initially they will document only what is seen by them. If an auto body shop later determines that additional damages exist or there is an increase in the price of parts, the MDA will write a "supplement." A MDA must speak to the insureds and explain his decisions regarding repair estimates. A MDA must also speak to claimants involved in accidents to explain his decisions regarding repair estimates. Forming good customer relationships is an important part of the claims adjustment process. When customers have a complaint about or regarding MDAs, MDAs refer them to someone else.

Employees in the MDA position customarily have $12,000 authority on each indemnity. All MDAs currently employed by CC Services have an authority to settle claims up to $12,000 authority level. MDAs only have draft authority after an investigation is completed, a determination of clear liability is made and the MDA is given approval to issue a draft. MDAs evaluate and prepare damage estimates in approximately 60% of all claims handled by CC Services' Claims Division.

A MDA receives his assignment from a file handler. A file handler could be a Field Claims Representative located in the Field Office, or the assignment could come from a Claims Representative located in the Corporate Claims Office. Approximately 70% of all assignments MDAs receive come from the Corporate Claims Office in Bloomington, Illinois and are handled through the Corporate Claims Office. MDAs with lower levels of authority may be assigned the same cases as those with higher authorities. Assignment of claims largely is left to the discretion of the Claims Office or Field Claims Supervisor, who assigns claims based on a variety of

criteria, including geographic location.  Geographic location is the most important factor affecting assignment of MDAs.  The information regarding the vehicle includes: the Vehicle Identification Number ("VIN"), location of vehicle, location of damage on the vehicle, owner's name, address, phone number and description of accident.  The MDA is required to inspect and complete his appraisal of a damaged vehicle within 48 hours of assignment.

As part of their job duties, MDAs are typically out of the office for much of their workday.  Examining vehicles to evaluate damage is typically done at an auto body shop or at the insured's or claimant's home or place of business.  MDAs are required to use their skills, knowledge and experience to determine if there is preexisting damage to a vehicle that is not related to the assigned claim and may not be covered under the policy.  MDAs must be able to evaluate and determine the cause of vehicle damage so that it will be properly attributed to the policies' collision or comprehensive coverage.  That decision may affect the amount of the deductible or even whether coverage exists at all.  MDAs learn from experience what particular damage looks like such as a "deer hit."   MDAs make no decisions with regard to coverage issues.  They notify file handlers whether the damage to the vehicle is consistent with the claimed damage.

MDAs not only inspect and write estimates on damaged automobiles; they also write estimates on tractor trailers, farm equipment, travel trailers, boats, etc.  Thus, MDAs must be familiar with different kinds of policies including farm, home and auto and commercial policies.  They must also determine the extent of

damage as opposed to the vehicle's ordinary wear and tear over time, and adjust the estimate accordingly. This adjustment is referred to as betterment. When requested by file handlers to inspect vehicles other than automobiles, MDAs document the damage, take photographs of the damage and the accident scene and make diagrams. Such duties result from work overloading by file handlers. Such work also consists of picking up police reports and taking pictures of buildings such as sheds and garages.

MDAs are responsible for identifying possible fraud in connection with a claim based on a comparison of vehicle damage and his or her discussions with the insured and/or claimant. They identify damage to the vehicle that is not consistent with the cause of the damage as reported by the field claim or claim office information. MDAs report inconsistent damage to the claim handler and document it in the ADP/PenPro ("ADP") computer software on-line notes. These discussions will lead the MDA to decide whether CC Services should pay the claim, deny the claim or refer the claim to the special investigation unit of CC Services because of a suspicion of fraud. Any action taken as a result of the MDA's reported observations is instituted by the file handler. After reporting the inconsistent damage the MDA has no further involvement.

MDAs must evaluate the damage to a vehicle to determine if a vehicle is able to be repaired of if it is a total loss. The MDA must first decide if the vehicle is a structural total loss or if it can be safely repaired at any cost. If it can be repaired, the MDA must first determine if the total repair costs exceed the value of the vehicle.

If the repairs do exceed the value of the vehicle, it will be declared an economic total loss.  If the MDA believes a vehicle may be a structural loss, she notifies the claim adjuster and uploads photographs to the home office.  The home office then makes the final decision whether a structural loss had actually occurred.  If the MDA determines that a vehicle is not a structural total loss or an economic total loss, she must then determine what parts are repairable and what parts need to be replaced.  If she determines that parts should be repaired, she must estimate the amount of time necessary to make such repairs.  MDAs determine how much time a repair should take by inspecting the damage at issue and applying a "rule of thumb" such that, in direct impact collision, the time allocation is one hour per the size of a hand and a half hour for secondary damage.  They learn the application of this kind of estimate based upon experience and what they have learned on the job.  MDAs have to evaluate damages and determine if they are going to repair or replace items, then determine what type of replacement parts will be used.  These choices will make a difference in the estimate for the repairs.  Claims representatives review estimates and sometimes have MDAs change the estimates provided.

        The terms ADP and CCC reference software tools that MDAs use to assist them in their jobs of evaluating and estimating costs of the vehicle damages.  MDAs use ADP to assist them in preparing their estimates.  After entering a VIN and other information based on an evaluation by the MDA, the ADP checks pricing information on parts and determines if there are aftermarket parts available in the area.  If an aftermarket part is available, the ADP will automatically place that factor

into the estimate and MDAs can deviate only from failing to use aftermarket parts when it can be documented by the MDA that the aftermarket part is unavailable.

If an MDA's estimate dollars exceed the threshold of the value of the vehicle the ADP will automatically mark the estimate a total loss and the ADP total determination cannot be countermanded by the MDA.  ADP assists in determining if there is a possibility of preexisting damage on a vehicle. The ADP will alert that there was a prior ADP damage estimate written on that vehicle.  ADP will display all areas of past repairs, the dollar amount of the estimate and when the estimate was written.  The ADP includes all past estimates submitted through ADP on the subject even if the past damage claim was processed for another insurance company.

CCC is a software program which a MDA uses after they determine that a vehicle is a total loss.  A MDA must prepare a form either manually or on CCC, which allows a value to be assigned to the vehicle.  In filling out the form on CCC, the adjuster provides the VIN, the vehicle features, condition of the vehicle and the model and mileage.  After inputting all the data, the CCC assigns a value to that vehicle.

In deciding a "course of conduct" with respect to repairing vehicles, the computer software will "red flag" an MDA that repair costs may exceed the value of vehicle and the MDA would notify the adjuster of this occurrence.  While ADP assigns labor costs to particular repairs, MDAs may negotiate hours necessary to repair an automobile with body shops to reach agreed parts prices and time spent.  ADP is not used to estimate the labor cost to repair a part.  Computer software is not used to estimate non-automobile vehicle claims such as boats, farm equipment, etc.  MDAs

must rely on boat shops, for instance, to provide that information.

MDAs may only deviate from the adjusting guidelines/procedures by documenting the reason for the deviation. Such deviations are recorded on a summary sheet or on-line activity log which is subject to an audit or supervisor's approval. MDAs are supplied with checklists to make sure they are compliant with the mandated procedures contained in the Claims Manual. Such compliance is subject to open and/or closed file review by either central claims officer representatives, field adjusters, in-house audit teams, the subrogation department, and/or supervisors. Field Supervisors obtain information on MDA performance principally through closed filed audits.

MDAs' estimates are compared monthly based on the percentage use of refinished parts, repaired parts, new parts, salvage parts and economy parts contained in the MDAs' estimates over the past month. Appraisal assignments are dated and timed when transmitted. All MDA submittals are electronic and the documentation input, uploaded photos, estimates are timed automatically when logged into ADP. There are approximately 28 computer driven criteria that are charted and monitored. Because ADP draws from a nationwide data base, MDA performance can be compared with other appraisers in the state or nation, including appraisers handling estimates for other insurance companies.

**FCR II and FCR III**

The pay range of the FCR II position is $34,715.00 to $52,072.00. The pay range for the FCR III is $44,623.00 to $66,934.00. The FCRs are paid a set

predetermined salary on a bi-weekly basis.  FCRs are not docked for partial day absences or violations of the rules.  FCRs investigate, inspect, evaluate and issue payments on claims within a prescribed authority level.  FCRs handle multiple lines of insurance claims including: home, auto, farm and other property claims.

      FCRs are responsible for contacting the insured to set up appointments and interview witnesses as to the nature and severity of the claims.  FCRs are generally the initial contact with the claimant or the insured after a loss is reported. A FCR must contact a claimant or insured quickly after a loss is reported in order to interview customers quickly while they still remember precisely what occurred and to provide good customer service.  FCRs must also communicate with claimants and insureds as to decisions involving amounts paid on a claim.  A FCR negotiates with insureds and claimants to settle claims within his authority limits.

      A FCR II has $12,000 in direct settlement authority on each indemnity. A FCR III has $15,000 in direct settlement authority on each indemnity.  Individual authority is established by Field Claim Supervisors on an employee by employee basis.  Out of 118 FCRs currently working at CC Services, only three do not have the maximum authority level.  In the absence of supervisor review and approval, FCRs do not have authority to approve bodily injury claims in amounts within their authority limits where an element of pain and suffering is involved.  Other than complexity of claims assigned, there is no difference between the tasks performed by FCR II and FCR III; the basic difference is that FCR IIIs have a greater skill and knowledge level.  FCRs do not have supervisory capacity over other employees.

FCRs receive their assignments on a daily basis.  They spend a great deal of their typical workday out of the office because they must interview witnesses, claimants and insureds, document damage and evaluate all types of claims.  FCRs are typically multi-line adjusters handling property and liability claims.  FCRs are expected to complete all parts of the claims management process in these multi-line claims, except for vehicle appraisals, which are completed by persons in the Material Damage Appraiser position. A FCR is responsible for investigating the claim which includes: interviewing claimants, interviewing insureds, interviewing witnesses, putting together estimates, examining medical records, taking photographs and diagraming the scene.  A FCR analyzes information after a factual investigation and makes a sound judgment based on his analysis.

After gathering facts and interviewing claimants, insureds and witnesses, these facts are evaluated to make a decision regarding coverage and liability.  A FCR must determine whether the claim is covered by the insured's insurance contract. A FCR must make decisions with regard to liability for the accident covered by the insurance policy.  FCRs then make prescribed payments within their authority levels. If a claim was beyond the FCR's prescribed level of authority, he must discuss the claim with his supervisor and obtain the necessary authority.

They are responsible for identifying and referring possible fraud claims to a Special Investigation Unit within CC Services.  FCRs were trained to be alert to "red flags" indicating the possibility of fraud in claims assigned to them and those "red flags" are listed in guidelines and checklists.  Should a suspicious circumstance

arise implicating the "red flag list" FCRs are to notify their supervisors.  FCRs are not authorized to disapprove claims they suspect might be fraudulent, and investigation into possible fraud and the evaluation as to the legitimacy of a claim are made at the supervisory level.  Where FCR investigations uncover facts that place a property damage claim potentially outside of available coverage, this information is brought to supervisors who would make the determination whether the claim is covered. Supervisory decisions on coverage issues were communicated to FCRs and documented in the on-line activity log.

Reserves on property files must be set by a FCR based on an evaluation of the claim.  Although reserves on property files must be set, this does not mean that the claim is going to be that amount, for it is only the FCR's best estimate.

CC Services distributed a full page laminated Property checklist applicable to every claim assigned to a FCR.  The checklist instructs, in a step-by-step fashion, what documentation is needed and what the FCR has to accomplish to handle a claim to proper conclusion.  Prior to the Model Office going on-line, the checklist was stapled to the file jacket of the claim folder and the FCR was required to check off items when completed.  FCRs use a similar checklist in handling auto claims. FCRs use the Claims Manual as a reference guide.  Direction on claims handling procedure is detailed in the Claims Manual and claims bulletins providing additional or supplemental directives would be incorporated into the Claims Manual. The evaluation of information which must be conducted is not contained in written materials.  While there are written materials to assist an adjuster in his investigation,

these materials do not tell the adjuster how to conduct an investigation. Best Practices as related to FCR time requirements include: (1) contact insured within one hour or at the time specified on the loss notice; (2) contact the claimant within 24 hours; and (3) complete investigation within four working days. They receive advice and direction from home office property consultants and property claims managers.

FCRs utilize two software programs: CCC and Boeckh. Boeckh references a software tool used by FCRs for estimating very large real property loss situations. Although a FCR may use computer programs as a tool to assist them in bringing a claim to resolution, the use of such programs is rare. FCRs have minimal training to use CCC and Boeckh. Normally, a FCR would not use any software in an automobile damage case because a MDA provides the damage evaluation. FCRs provide no information to MDAs to assist the utilization of ADP or CCC to determine auto damage valuations. Boeckh acts as a calculator so that the FCR does not have to make the calculations on large property loss claims himself. Boeckh displays information better if information is written out manually. Boeckh does not have any fields explaining the coverage available to the insured.

Beginning in January 2005, Supervisor computer calendared reviews are initiated three days after file assignment as opposed to five days after generation. The scheduled reviews are face to face with the field supervisor rather than being strictly on-line. The review intervals are more frequent (3 day, 5 day, 10 day, 25 day and every thirty days thereafter as opposed to the previous 5 day, 25 day and every thirty days thereafter schedule).

**PS I**

The pay range for the PS I position is $51,582.00 to $77,374.00.  The PSs are paid on a predetermined salary on a bi-weekly basis.  PSs are not docked for partial day absences or violations of the rules.  A PS investigates, evaluates, negotiates and settles serious or problematic real property claims.  PSs do not have supervisory capacity over other employees.

PSs are responsible for contacting the insured to set up appointments and interview witnesses as to the nature and severity of the claims.  PSs are generally the initial contact with the claimant or the insured after a loss is reported.  A PS must contact a claimant or insured quickly after a loss is reported in order to interview customers quickly while they still remember precisely what occurred, and to provide good customer service.  PSs must also communicate with claimants and insureds as to decisions involving amounts paid on a claim.  A PS negotiates with insureds and claimants to settle claims within his authority limits.

PSs have $20,000 in direct settlement authority on each indemnity.  The individual authority is established by Field Claim Supervisors on an employee by employee basis.  All PSs currently have an authority level to settle claims up to $20,000 without a supervisor's approval.

PSs receive their assignments on a daily basis.  They spend a great deal of their typical workday out of the office because they must interview witnesses, claimants and insureds, document damage and evaluate all types of claims.  PSs are responsible for adjusting the most serious property claims by gathering statements

of insureds, witnesses or other claimants.  Additionally, PSs gather information by obtaining fire and police reports, taking photographs, making diagrams and obtaining any repair or replacement estimates.

They investigate and check property coverage issues.  After gathering facts and interviewing claimants, insureds and witnesses, these facts are evaluated to make a decision regarding coverage and liability.  A PS must determine whether the claim is covered by the insured's insurance policy.  A PS must make decisions with regard to liability for the accident covered by the insurance policy.  PSs then make prescribed payments within their authority levels.  If a claim was beyond the prescribed level of authority, he must discuss the claim with his supervisor and obtain the necessary authority.

PSs are responsible for identifying and referring possible fraud claims to CC Services' Special Investigation Unit.  They must first verify coverage and then investigate to determine if the claim is a legitimate one.  A PS typically sets all of his own reserves and run a salvage program in his offices.

CC Services distributed a full page laminated Property checklist applicable to every claim assigned to a PS.  The checklist instructs, in a step-by-step fashion, what documentation is needed and what the PS has to accomplished to handle a claim to proper conclusion.  Prior to the Model Office going on-line, the checklist was stapled to the file jacket of the claim folder and the PS was required to check off items when complete.  PSs are required to investigate, evaluate and pay property liability claims based on strict guidelines set forth in checklists, directives

and the Claims Manual.  They receive advice and direction from home office property consultants and property claims managers.

Boeckh references a software tool used by PSs for estimating very large real property loss situations.  Boeckh acts as a calculator so that the PS does not have to make the calculations on large property loss claims himself.  PSs use Boeckh on a more routine basis.  It is essentially an excel spreadsheet wherein a PS can list property losses by each room.  PSs also use skill in determining composition of damaged material to make property valuations.

### III.  <u>Summary Judgment</u>

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c);** *Oats v. Discovery Zone*, **116 F.3d 1161, 1165 (7th Cir. 1997)(citing** *Celotex Corp. v. Catrett*, **477 U.S. 317, 322 (1986))**.  The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law. *Santaella v. Metro. Life Ins. Co.*, **123 F.3d 456, 461 (7th Cir. 1997)(citing** *Celotex*, **477 U.S. at 323)**.  The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *Regensburger v. China Adoption Consultants, Ltd.*, **138 F.3d 1201, 1205 (7th Cir. 1998)(citing** *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 255 (1986))**.

In response to a motion for summary judgment, the non-movant may

not simply rest upon the allegations in his pleadings.  Rather, the non-moving party must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial.  ***Walker v. Shansky*, 28 F.3d 666, 670-71 (7th Cir. 1994), *aff'd*, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324)**.  In reviewing a summary judgment motion, the court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial.  ***Dykema v. Skoumal*, 261 F.3d 701, 704 (7th Cir. 2001)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249)**.  The "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to show a genuine issue of material fact."  ***Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 933 (7th Cir. 1997)(citing *Anderson*, 477 U.S. at 252)**.

No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  ***Anderson*, 477 U.S. at 249-50 (citations omitted).  *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996), cert. denied, 519 U.S. 1055 (1997); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994)**.  "[P]laintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment."  ***Weeks*, 126 F.3d at 939**.  Further, Plaintiff's own subjective belief does not create a genuine issue of material fact.  ***Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 401 (7th Cir. 1997)**.  "If the subjective beliefs of

plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." ***Id.* (quoting *Mills v. First Fed. Sav. & Loan Assoc.*, 83 F.3d 833, 841-42 (7th Cir. 1996))**.

By filing cross-motions for summary judgment, parties do not waive their right to a trial on the merits. ***Market St. Assocs. Ltd. P'ship v. Frey,* 941 F.2d 588, 590 (7th Cir.1991)**. Each party is merely asking a court to grant it judgment without a trial but, if the judge disagrees, each wants a trial. ***Miller v. LeSea Broad., Inc.,* 87 F.3d 224, 230 (7th Cir.1996). *But see Cook Inc. v. Boston Scientific Corp.,* 333 F.3d 737, 738 (7th Cir.2003) (finding an implied waiver to trial where the parties wanted a trial limited to the summary judgment record)**. Each movant individually must fulfill the requirements necessary to obtain summary judgment under **Federal Rule of Civil Procedure 56**. A court is not required to grant summary judgment as a matter of law for either side when faced with cross-motions for summary judgment. **See *Frey,* 941 F.2d at 590 (distinguishing cross-motions for summary judgment from a trial on the papers, where a judge must enter judgment for one party)**. Rather, the court is to evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant. ***Brownlee v. City of Chicago,* 983 F.Supp. 776, 779 (N.D.Ill. 1997)**.

## IV.  <u>Analysis</u>

The FLSA provides that an employer must compensate an employee for any hours worked over 40 hours in a week at a rate of one and one-half times the employee's regularly hourly wage.  The overtime requirement is subject to a number of exemptions, including an exemption for persons "employed in a bona fide executive, administrative, or professional capacity."  **29 U.S.C. § 213(a)(1)**.  Such exemptions are construed narrowly against the employer seeking to assert them.  *See Arnold v. Ben Kanowsky, Inc.,* **361 U.S. 388, 392 (1960)**.  The employer bears the burden of demonstrating an employee's exempt status.  *Id.* **at 394**; *Corning Glass Works v. Brennan,* **417 U.S. 188, 196-97 (1974)**.  "FLSA claims typically involve complex mixed questions of fact and law...."  *Barrentine v. Arkansas-Best Freight Sys., Inc.,* **450 U.S. 728, 743 (1981)**.  While the question of how employees spend their time working is a question of fact, "[t]he question whether their particular activities excluded them from overtime benefits of the FLSA is a question of law."  *Icicle Seafoods, Inc. v. Worthington,* **475 U.S. 709, 714 (1986)**.

The FLSA does not define "executive, administrative, or professional capacity"; instead it expressly delegates that task to the Secretary of Labor who may from "time to time" alter the definitions.  **See 29 U.S.C. § 213(a)(1)**.[3]  Under the old

---

[3]On April 23, 2004, the Secretary of Labor issued a comprehensive set of new regulations, see 69 Fed.Reg. 22,260.  "The FLSA's duties test, which determines which jobs qualify for exempt status, had not been changed significantly since 1949. ... [t]he new definitions do not apply retroactively."  *Kennedy v. Commonwealth Edison Co.,* **410 F.3d 365, 369 (7th Cir. 2005)**.

regulations, there was a long test, *see* **29 C.F.R. § 541.2(a)-(e) (2001)**, and a short test, *see* **29 C.F.R. § 541.214 (2001)**, to determine whether an employee fell within the administrative exception.[4]  Because the four positions in this case earn more than $250 per week, the parties agree that the short test should be used in this case, which applies to "high salaried administrative employees."  **29 C.F.R. § 541.214**. Under the short test, an employee is exempt if: (1) the employer has to pay the employee on a salary basis, as defined in the regulations; (2) the primary duty of the employee must involve office or nonmanual work directly related to management policies or general business operations; and (3) the employee's job has to include work requiring the exercise of discretion and independent judgment. ***Kennedy*, 410 F.3d at 370 (citing *Piscione v. Ernst & Young*, 171 F.3d 527, 533 (7th Cir. 1999))**.

### A.  MDA II Position

**Salary Basis**

First, CC Services has to show that it paid MDAs on a salary basis. However, the Court need not address this issue in depth as the parties agree that this prong has been met.  There is no dispute that MDAs are compensated at a rate of not less than $250 per week.

---

The parties agree that the old regulations apply in this matter.  Thus, citations to regulations are the 2001 version.

[4]Under the new regulations, there is just one test, *see* **29 C.F.R. § 541.200 (2004)**.

**Primary Duty**

Next, CC Services has to show that the MDA's duties "consist primarily of office or nonmanual work directly related to management policies or general business operations." ***Kennedy*, 410 F.3d at 372 (quoting *Haywood v. North Amer. Van Lines*, 121 F.3d 1066, 1070 (7th Cir. 1997)).** Since the parties agree that the MDA position does nonmanual work, the Court must determine whether the MDAs' primary duties directly relate to CC Services' management policies or general business operations.

The old regulations provided that work "directly related to management policies or general business operations" includes activities "relating to the administrative operations of a business." **29 C.F.R. § 541.205(a)**. "The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, *negotiating, representing the company*, purchasing, promoting sales, and business research and control." **29 C.F.R. § 541.205(b)(emphasis added)**. The phrase "directly related to management policies or general business operations" limits the exception to "persons who perform work of substantial importance to the management or operation of business of *his employer or his employer's customers*. **29 C.F.R. § 541.205(a)(emphasis added)**. "These interpretive regulations suggest a dichotomy between 'production' and 'administrative' jobs." ***Shaw v. Prentice Hall Computer Pub., Inc.,* 151 F.3d 640,**

**644 (7th Cir. 1998)**.  While every job context is different, "the typical example of the production/administrative dichotomy is a factory setting where the 'production' employees work on the line running machines, while the administrative employees work in an office communicating with the customers and doing paperwork." ***Id.***   In fact, the regulations state that employees' job duties are "directly related to management policies or general business operations" if they work as "advisory specialists and consultants of various kinds, credit managers, safety directors, *claim agents and adjusters*, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, [and] promotion men."   **29 C.F.R. § 541.205(c)(5)(emphasis added)**.   Administrative tasks constitute an employee's primary duty if the tasks represent "the major part, or over 50 percent of the employee's time."   **29 C.F.R. § 541.103**.   An employee who negotiates with clients and settles damage claims on behalf of an employer engages in duties consistent with servicing of a business even though those activities can be viewed as ancillary to the provision of a good or service.   ***Haywood*, 121 F.3d at 1072.**

Under either analysis (the administrative/ production dichotomy or the straightforward approach), the Court finds that the MDAs' duties are directly related to the management policies or general business operations of CC Services and its customers.   **29 C.F.R. § 541.205(d)**.   CC Services contracts with insurance companies, who write and sell insurance, to provide personnel services, including

all services in the insurance claims area.  The MDAs service CC Services' customers' insurance policies and carry out CC Services' adjusting policies.  Specifically, MDAs represent CC Services and its customers in negotiations with body shops, insureds and claimants.  They negotiate with body shops to obtain better hourly rates, to reduce the numbers of hours to complete a task, and regarding repairing a part as opposed to replacing it, when possible.  Further, Roe-Midgett testified that good negotiation skills are essential to performing well as an MDA.  They also represent CC Services and its customers when they speak with witnesses, insureds, and claimants.  Further, MDAs evaluate damage in approximately 60% of all claims handled by CC Services.  On behalf of CC Services' customers, MDAs settle claims within a $12,000 prescribed authority level.  In 2004, the Claims Division paid out $606,300,333 in claims.  In the past three years, approximately 95% of vehicle claims have settled for less then $12,000.  These duties are the types of classic administrative functions the regulations, **29 C.F.R. § 541.205** contemplates.  MDAs perform functions analogous to those performed by claims agents and adjusters, who are specifically mentioned by the regulations as meeting the "directly related" test.  **29 C.F.R. § 541.205(c)**.  Cumulatively, MDAs spend most of their day evaluating, negotiating and representing CC Services and its customers.  The MDAs "directly related" duties are their primary duties.  Thus, the MDAs primary duties are directly related to management policies or general business operations.

### Discretion and Independent Judgment

Finally, CC Services must show that the undisputed facts demonstrate that the MDAs' duties involve exercise of discretion and independent judgment.  **29 C.F.R. § §541.2(e)(2)**.  In ***Kennedy***, the Seventh Circuit stated:

> This determination requires "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered.... [It] implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance."  29 C.F.R. § 541.207(a).  "While the regulations require the employee to exercise independent judgment, the term does not require this judgment to be made in isolation."  *Piscione*, 171 F.3d at 535 (emphasis removed).  The fact that others may review or even reverse an employee's judgment does not mean necessarily that the employee will fall outside the FLSA's administrative exemption.  *Id.*

***Kennedy*, 410 F.3d at 374**.

In this case, the MDAs' duties include the exercise of discretion and independent judgment.  MDAs are largely unsupervised.  Approximately 70% of MDAs' assignments come from the Corporate Claims Office and the MDAs' evaluations on such files generally will not be seen by their immediate supervisors.  MDAs investigate, document and evaluate damages to vehicles.  They also negotiate with insureds, claimants and body shops and settle cases.[5]  The MDAs' settlement authority is $12,000.  In evaluating vehicular damage, MDAs must make independent choices, free from immediate direction or supervision.  MDAs first determine if the

---

[5]Negotiations demand more than the bare application of learned skills in conformance with prescribed procedures.  ***See* 29 U.S.C. 541.207(c)**.

vehicle is a structural or economic total loss, so that no repairs should take place. While MDAs use ADP as a tool, the ADP does not take discretion and judgment away from MDAs.  MDAs must also make the decision of whether a damaged part should be repaired or replaced.  The ADP does not assist in this process.  If the decision is made to repair the part, the MDA must estimate the repair time.  Again, the ADP does not assist in this process.  While there are reviews of leakage and claim overpayments, these reviews take place during a closed file review and closed file audits.  The reviews of MDAs' substantive decisions, as opposed to timeliness reviews, take place after the files are closed.

   As noted above, MDAs devote the majority of their daily time to evaluating, negotiating, handling and settling claims.  The fact that CC Services often require MDAs to obtain supervisor approval from time to time, to follow guidelines/procedures and to utilize computer software does not alter the fact that CC Services relies upon MDAs to exercise discretion and independent judgment in the management of claims and dealings with claimants, insureds and body shops. *See Kennedy*, **410 F.3d at 374 ("While the plaintiff's discretion may be channeled by the regulations that apply to this industry, that does not mean [defendant's] employees do not exercise independent judgment.")**.  Accordingly, the Court finds that CC Services has met its burden that MDAs fall within the FLSA's administrative employee exemption as a matter of law.

### B.  The FCR II, FCR III and PS I Positions

**Salary Basis**

First, CC Services has to show that it paid the FCRs and the PSs on a salary basis.  Again, the Court need not address this issue in depth as the parties agree that this prong has been met.  There is no dispute that the FCRs and the PSs are compensated at a rate of not less than $250 per week.

**Primary Duty**

Next, CC Services must show that the FCRs and the PS' duties consist primarily of office or nonmanual work directly related to management policies or general business operations.  As with the MDA position, the parties agree that the FCRs and the PSs do nonmanual work, thus, the Court must determine whether the duties directly relate to CC Services' management policies or general business operations.

Under either analysis (the administrative/ production dichotomy or the straightforward approach), the Court finds that both the FCRs and the PSs' duties are directly related to the management policies or general business operations of CC Services and its customers.  **29 C.F.R. § 541.205(d)**.  As stated above, CC Services contracts with insurance companies, who write and sell insurance, to provide personnel services, including all services in the insurance claims area.  FCRs and PSs service CC Services and its customers in negotiations with insureds and claimants.  They represent CC Services and its customers when they interview

witnesses, insureds and claimants.  They also answer questions and complaints about coverage and claim payments.  In fact, Decker testified that the Claims Division was very important to its insurance customers.  In 2004, the Claims Division paid out $606,300,333 in settlements.  Further, they settle claims within a prescribed amount: FCRs have the settlement authority per indemnity between $12,000 and $15,000 and PSs have the settlement authority per indemnity of $20,000.  In the last three years, approximately 95% of vehicle claims have settled for less than $12,000.  Thus, they have the authority to settle the majority of the claims for CC Services and its customers.  These duties are the types of classic administrative functions the regulations, **29 C.F.R. § 541.205** contemplates.  FCRs and PSs perform functions analogous to those performed by claims agents and adjusters, who are specifically mentioned by the regulations as meeting the "directly related" test.  **29 C.F.R. § 541.205(c)**.  Cumulatively, FCRs and PSs spend most of their day evaluating, negotiating and representing CC Services and its customers.  The FCRs and PSs "directly related" duties are their primary duties.  Their duties have a substantial financial impact upon the insurance companies they service.  Thus, the FCRs and the PSs primary duties are directly related to management policies or general business operations.

### Discretion and Independent Judgment

Finally, CC Services must show that the undisputed facts demonstrate that FCRs and the PSs' duties involve exercise of discretion and independent

judgment. **29 C.F.R. § §541.2(e)(2)**.  In this case, the FCRs and the PSs' duties include the exercise of discretion and independent judgment.  They are largely unsupervised and spend a great deal of their typical work day out of the office.  They investigate, inspect and evaluate claims as well as issue payments on claims for all lines of insurance sold by CC Services' customers.  PSs handle the more serious and problematic property claims for CC Services' insurance companies.  FCRs and PSs represent CC Services by negotiating with claimants and insureds and interviewing witnesses.  The settlement authority within these three positions range from $12,000 to $20,000 (FCRs - 12,000 to $15,000 and PSs - $20,000).  Approximately 95% of all claims handled by FCRs are settled within their authority.  They identify coverage issues and also identify possible fraudulent claims as well.  They also set reserves in all property claims and in several other claims as well.  The closed file review is to determine if the documentation complies with CC Services' Best Practices and Department of Insurance regulations.  These reviews are not conducted for the purpose of or to change the decisions; these reviews are done to identify needs for training and to determine leakage.  Further, the open file review is to make sure that FCRs and PSs are in compliance with state law timeliness and documentation requirements; these reviews are not done to review any substantive decision-making process.

        As noted above, FCRs and PSs devote the majority of their daily time to evaluating, investigating, negotiating, handling and settling claims.  Although CC Services does provide guidelines and checklists to the FCRs and the PSs, the Court

finds that these do not constrain the FCRs and the PSs' actions to prevent them from exercising independent judgment.[6]  Moreover, the fact that CC Services often require FCRs and PSs to obtain supervisor approval and/or review from time to time, to follow guidelines/procedures and to utilize computer software does not alter the fact that CC Services relies upon FCRs and PSs to exercise discretion and independent judgment in the management, negotiating and settlement of claims and dealings with claimants and  insureds.  Accordingly, the Court finds that CC Services has met its burden that FCRs and PSs fall within the FLSA's administrative employee exemption as a matter of law.

## V. <u>Conclusion</u>

Having reviewed the Plaintiffs' jobs under the FLSA's short test, in light of the record, the Court finds that CC Services has shown that Plaintiffs and the positions of MDA II, FCR II, FCR III and PS I were properly classified as exempt from the FLSA's overtime requirement.  Accordingly, the Court **GRANTS** Defendant's motions for summary judgment (Docs. 63 & 67) and **DENIES** Plaintiff's cross motion for summary judgment (Doc. 78).  Lastly, the Court **DENIES** the motion to strike (Doc. 85).  The Court **DIRECTS** the Clerk of the Court to enter judgment in favor of

---

[6]The insurance industry is highly regulated.  As such guidelines regarding timeliness and documentation are necessary for compliance with state law.  A review of the Best Practices guidelines reveals that they do not contain any directions regarding the decision making process.  Further, the checklist that CC Services provides is a listing of responsibilities that a PS must complete prior to finishing the evaluation and investigation process.  It does not take away any of the discretion and independent judgment that must be exercised by a PS.  In fact, Decker testified that the Claims Manual and other information given to the Claims Division employees do not explain how to resolve any particular claim because all claims are different and must be resolved individually.

Defendant CC Services, Inc., and against Paula Roe-Midgett and Paul Decker.

**IT IS SO ORDERED.**

Signed this 29th day of March, 2006.

/s/          David   RHerndon
**United States District Judge**